0907 Marriot International Resorts v. United States, Mr. Gilmour. Yes, sir. May it please the Court, my name is Arthur Gilmour. I'm a pro-memory and I represent the appellant in this case, Marriot. The issue before this Court is a technical interpretation of a section of the Internal Records Code, specifically Section 752 of the Internal Records Code. And the question is whether in 1994, when the transactions in this case took place, did the term liability, as it's used in Section 752, include an obligation to put the shorts on? And the answer to that question is that no reasonable taxpayer in 1994 would have concluded that. So why can't I read 752 itself to say any increase in a partner's share of the liabilities? And that seems to be pretty broad and sweeping, doesn't it? Well, the question is what's liability? And that's what the patent court dealt with. And that's, if you were looking at 752 in 1994 and you were asking yourself the question, what is liability, what does that section mean? You would look at the case law that had come down by that time from the tax court, where the tax court adopted the IRS's position that a liability has to be a fixed and certain obligation. It cannot be a contingent obligation. Why wasn't your liability pretty well fixed and certain by the end of this tax year anyway? You didn't have any contingencies. You had already closed all of the transactions. Once the short sale was closed, I mean, the short sale was closed. It's gone. Yes, you had. You had done that in this tax year. You didn't have any contingency. Your Honor, the question is, was the short sale a liability at the time the obligation, or was the obligation to close the short sale a liability at the time that it was contributed to the partnership? That's the discrete legal issue. But the liability attached and went with the short sale. At the time you got, at the time the short sale was transacted, you took on the liability at that point. You had the obligation. Absolutely. When the short seller borrows the security. There was an uncertainty, though, like in the jury trial case where we didn't know whether liability would be assessed or not. You are liable in this instance the minute you make the short sale. So the contingency just doesn't seem right to me. Right. Well, Your Honor, that really, and the case that I would cite that any taxpayer would have looked at in 1994 is the LaRue case, which I think answers your question specifically. In LaRue, it was not a short sale in LaRue. But in LaRue, it was a brokerage. The partnership was a brokerage. And the partners, and the brokerage had made backroom errors. The backroom errors had to be corrected. There was no question that there was legal liability. In fact, the tax court made that point. But it said it's still not a liability for Section 752 purposes. And the reason is because the amount of the liability could not be determined until the brokerage errors were corrected. So it isn't enough that the fact of liability is fixed, the amount of liability. No, in the counsel in LaRue, the court says there's no way to determine when or whether an obligation might arise. So it wasn't that the amount wasn't fixed. It was whether there was an obligation or not. Here, there's clearly an obligation. There was no contingent sale issue in LaRue. It didn't increase basis for partnership assets. It's not directly on point, is it? LaRue did not involve an increase in basis in the partnership. But Helmer did. And so if one reads Revenue Ruling 8877, and I'm jumping to that issue because I think that's the issue Your Honor is addressing, Revenue Ruling 8877. If one reads Revenue Ruling 877 the way the IRS argues, the government argues one should read Revenue Ruling 8877, the holding in Helmer would be wrong because there was an increase in basis. And in fact, that's why we indicated that there are at least two decisions before this court now, the Jay Trading case and the Stoney Creek case, that are related to this case. They deal with options, which are another kind of contingent obligation. And the court of federal claims, I think it was Judge Williams and Judge Miller, continue to recognize the validity of the Helmer case, which is inconsistent with the government's reading of 8877. In other words, if Judge Letow is correct in our case, then Judge Williams is wrong and Judge Miller are wrong in the way in which they read Helmer and continue to recognize the validity of Helmer well into the 1990s. Now Helmer was subsequently disavowed by the IRS in 2003 when they issued regulations. And in 2003, the IRS adopted the broad definition that they now apply to these kind of obligations. But what's interesting is in 2003, they specifically said, we recognize we are not following Helmer. So in 2003, the IRS walked away from Helmer. The decision, the tax court agreed with the IRS. They walked away from Helmer. They said they were walking away from Helmer. And now they want to read a 1988 revenue rule as essentially having not followed Helmer, disavowed Helmer. I don't know if I got to the gist of your question. The trial court in this case will even rely on 88 revenue ruling as much as Regulation T of the Federal Reserve anyway. Let me address Regulation T. And Regulation T is the regulation the Federal Reserve Board issues to protect the broker dealer in a short sale transaction. And it requires that collateral be maintained with the broker dealer to protect the broker dealer. And it has to be read in conjunction with the exchange rule, which is typically Exchange Rule 431. It created deficiency. Why doesn't that apply right here? Because Regulation T, when read in conjunction with the exchange rule, what it really tells you is that the collateral itself is not fixed. The collateral itself changes. It's contingent. The marginal requirement moves from day to day depending on the value of the security. That's why if the underlying security, the short sold security, increases in value, which of course the short seller doesn't want to see happen, the margin is called and the short seller has to give more collateral to the broker and dealer. On the other hand, if the underlying security decreases in value, then margin is released. Do I have to find that this is in fact a contingent obligation in order for you to prevail? Yes, Your Honor. So if I disagree with your contingent obligation, then the case is over? I think, Your Honor. I just want to make sure there aren't any other arguments that I'm not thinking through. I hope I'm not missing any arguments, Your Honor. But that is ultimately the real issue. Is this a fixed and certain obligation or is this a contingent obligation? And again, you have to put yourself in the context of 1994 and what the case law would have told any taxpayer in 1994, and that is that a contingent obligation is simply not a liability. I mean, I understand that I'm bound by the code and that you're suggesting to me that Judge Rader's reading or suggestion that any increase in partner's share of liabilities, somehow the word liability doesn't apply here. But simply as a policy matter, as Judge Rader explained in his opinion, it's hard for me to follow how you can say the short sale proceeds increases a partnership basis, but the obligation to cover the short sale doesn't decrease the outside basis. How does that work? I buy a house. When I buy a house, then I take on a mortgage. I sell the house to someone else. You know, mortgage has to be satisfied too. The obligation goes with the transaction. It's the way it works. It's just policy. I mean, I feel like this would be a tremendous windfall if you only had to declare the transaction in the first part of the short sale but not the obligation to repay. It just seems nonsensical from a policy standpoint. So what you're asking for is what I perceive to be a nonsensical interpretation of the statute. So if the statute is, in fact, nonsensical and I have no choice but to adopt that, well, then my hands are tied. But that's where I'm struggling. So tell me from a policy standpoint how I'm wrong or misunderstanding what the situation is. From a policy standpoint, and I would actually cite the court to the district court decision in Klamath, which discusses this at some length, what the court sees as nonsensical is exactly what the IRS's position was. And they taxed partners on that basis. And the LaRue case is an excellent example. In LaRue, the partners had a legal liability, and they had income from the partnership, and they wanted to use the reserve against that income. They wanted to treat the reserve as liability. And it was a legal liability. No one argued that it was a legal liability. But the IRS said, no, you can't do that. We're going to tax you on this income, and you cannot use this liability against us. And the partners were taxed, and the tax court upheld the IRS's position. So I understand the court's argument, but this is the point that the court in Klamath made. When the government made a similar argument, the government was only too glad to take that position when it increased revenues. And the court in Klamath said, you're arguing out of both sides of your mouth. It depends which ox is being bored. When it increases revenues, you have no problem with this position. When it doesn't increase revenues, you argue it can't be that way. How do you avoid the government's assertion that you're really just another boss scheme? We're not a boss scheme, Your Honor. And I have to say, it's unfortunate that the government has used this case to make that kind of an argument. But if we would have told you, how would we refute the boss scheme if it came before us tomorrow? Well, it's very simple. The short sales here had economic substance. The government argues the short sales did not have economic substance. This issue was never presented to the trial court as part of the subject matter. So it's just a matter of business purpose? Well, they'll manufacture a business purpose, won't they? Your Honor, the evidence in this case, which is not before the court right now, because the government chose not to move on that issue. The evidence shows that these short sales were used as legitimate hedges to protect Marriott from very significant interest rate risks. This was not a son of boss case. The son of boss cases are typically mass marketed, highly structured, prepackaged transactions, which are all about financial mechanics. And when they do use a short sale, the short sale has no business purpose and is typically only open for a few days. This short sale, these short sales, were open for months. At least the first one was open for several months. And there is no dispute that they were used as hedges to protect Marriott against very substantial interest rate risks from holding a portfolio of mortgages from their timeshare business, which they securitized. And then there's only going to be a bezel if you want to shave it. Yes, Your Honor. All right. Thank you. Joan Oppenheimer for the Commission of Internal Revenue. I find it curious that a public counsel has spent this whole argument without talking about the case that's on all fours with this case, which is Corman v. United States. Well, but it really isn't, is it? Because Corman dealt with a post-95 short sale liability. Well, that is the only respect in which that case differs. That's a pretty significant fact, isn't it? I mean, they're having to base their judgment on things that happened before the 95 revenue ruling. What would have told them in 95 that you were going to go the way you did? Well, first of all, the 1988 revenue ruling on which the court relied on this case, in which the tax court relied on Salina Partnership in a case involving the 1992 tax year, which also preceded the revenue ruling by three years. Furthermore, under Section 7805B of the Internal Revenue Code, revenue rulings are retroactive unless otherwise stated therein. It was not otherwise stated in Revenue Ruling 95-26. So therefore, the revenue ruling was retroactive. And there are countless cases by the Supreme Court that basically say it doesn't matter if you make notice of the statute or not. Even retroactive tax statutes have been upheld and applied to taxpayers that had no notice that the retroactive statute would be applied. The only thing that notice is relevant for is the imposition of penalties. If you don't give notice of the statute and a penalty is imposed under Section 6664 of the Internal Revenue Code, you might have a reasonable cause, good faith defense against the penalties. No penalties were imposed in this case. In Welch v. Henry, the Supreme Court said a tax is not a penalty, nor is it an obligation you incur by contract. It is simply a method of apportioning the cost of running a government, and all who share the benefits of government must share its burdens. So the Supreme Court, in countless cases, including Welch v. Henry, United States v. Carlton, and Milliken v. U.S., had explicitly held a retroactive tax. Indeed, in Carlton and Milliken, the retroactive tax was upheld even though the taxpayer undertook a transaction in detrimental reliance on the state of the law as it previously was before the law was changed. Furthermore, there are countless cases in the Supreme Court and in this Court where a taxpayer apparently relying on a loophole in the law has constructed a transaction and in fact has held to be in literal compliance with the statute, which is not this case. But nevertheless, the Court has held that the loophole didn't work. For example, in Gregory v. Halbering, there was a transaction. If we buy Mr. Wilmore's argument that these liabilities are completely contingent, you really don't know what their value is, how can they be liabilities? You don't even know what their final outcome is going to be. Well, it's our position that they are not contingent liabilities. But that was not my question. If we agree that they're contingent, you lose. That's correct. I agree with you. But they're not contingent, that's our position. The law is well established. Did anybody, as Judge Moore pointed out to folks in counsel, did anybody who sells securities for sure has an unconditional obligation to engage in a covering transaction to close the short sale? Revenue Ruling 9545 establishes that for purposes of these transactions, the amount of the covering purchase is deemed to be the amount of the proceeds of the short sale. And Fifth Circuit in Korman agreed with that. Was there anything before Korman that made a short sale contingent? No, a short sale was never contingent. There's absolutely no law at all that supports Apollon's position on a short sale. And the cases they rely on are a totally different type of obligation. In Korman, the Fifth Circuit held that a short sale is a unique transaction. The reason it's a unique transaction is because the short sale and the covering purchase are inextricably linked. Basically, you can't have one without the other. No broker is ever... Here we have $75 million worth of T-notes that have been sold short, which created proceeds of $75 million. First of all, Regulation T requires that the amount of these proceeds are frozen in the account at the time of the transaction. No broker is going to let somebody who's borrowed $75 million just take this money out of their account and walk away with it. So to treat this as a fixed asset and including it in basis while treating the offsetting obligation as contingent liability flies in the face of reality, as the Fifth Circuit said in Korman. They would argue that they have to keep that basis somewhere. They just don't attach it to the partnership. Well, the only question in this case is, does it increase the partnership's basis? Now, and that's really the whole way this scheme worked, is you have a Marriott entity that sells securities short. Now, the whole way this whole scheme works is they transfer it to the partnership near, and they don't take into account the offsetting obligation. If they didn't transfer this stuff to the partnership, we would not be before you. And what more the corporation did with its basis would be before this court. What they're trying to do is rely on what appeared to be a loophole in the tax law at the time. But that loophole applied to options, for example, which were an entirely different sort of situation from what you have in the short sale. And jade trading and Sylvie Creek, on which the account relies, are completely different from what we have here. What you had in jade trading, for example, was a call option on the euro. A call option obligates the seller of the option to deliver the underlying commodity, which in that case were euros. If on the last day of the option period, the euro was in the money. So if the euro is not in the money, the option expires worthless. So it's an entirely different situation here. The option may be in the money. It may not be in the money. Even if it is in the money, the purchaser may choose not to exercise it for whatever reason, negligence or who knows. Whereas in this case, it's undisputed that there is an unconditional obligation to close the short sale. Furthermore, all those other cases are distinguishable because what we have is a situation as described in Revenue Ruling 8877 and amplified in Revenue Ruling 9525, where you have an obligation that creates or increases the basis of partnership assets. Here you have a short sale that gives rise to an increase in $75 million in assets. Accordingly, the offsetting liability should be taken into account. That was not the case in Stokely Creek. It was not the case in jade trading. Nor was it the case in LaRue. In LaRue, you had a reserve that was set aside for back office failure spot. It was a contingent obligation because it was unknown how many people would come forward to claim money based on their securities losses. It was unknown if anyone would come forward. Furthermore, we did not have as here an asset which gave rise to a liability which caused an increase in the partnership basis. The cases on which the Policy Council relies are very different from the cases that we have here. It is simply not... Furthermore, accountant keeps on talking about notice. Well, if they were so interested in notice or if they were uncertain how this transaction should have been taxed, they could have requested a private letter ruling from the government, from the IRS, and the IRS would then have been bound by whatever it said in the private letter ruling. The Policy Council didn't do that. Perhaps they were just relying on audit roulette. Hopefully, this transaction would not be uncovered. Basically, there is no meaningful distinction between this case and Korman. In Korman, the Fifth Circuit held that the revenue rulings were entitled to substantial weight because they were reasonable. The reasonableness was based on the absurd economic result that would follow if the taxpayers' position were upheld. The Fifth Circuit said, on page 455 to 456, we are particularly struck by the absurd result that would arise if we were to accept Appellant's argument that the obligation to close a short sale is not a liability for purposes of Section 752. In that court, it added that it was reluctant to adopt any definition of liability that would defeat the manifest intent of Congress and would allow the trust to continue its conspicuous reign on the Treasury in the use of this tax shelter. And then it goes on to say that before it began its experssion into Subjective K of the Code, it would be remiss if it didn't comment on the elephant in the room. That elephant would be the fact that the Korman Partnership suffered only a $200,000 economic loss in closing the short sale, but it claimed a $102.6 million loss in connection with the transactions. And then the individual partner in the trust took its proportionate share of the loss and its returns and used it to offset legitimate income in the following years. The Fifth Circuit then characterized this premeditated attempt to transform the wash transaction for economic purposes into a windfall for tax purposes as reminiscent of an alchemist's attempt to transmute lead into gold. Well, the same alchemist's attempt is present here. This is exactly the same type of transaction that was present in Korman, and the fact that it wasn't a mass-marketed transaction makes no material difference. Also, opposing counsel's argument about the supposed economic substance of the transaction has no bearing in this case. Economic substance would basically be an issue that was not decided in this court, in the court below. Perhaps it would be decided on land if this court reverses the court below, but basically appellant is attempting to inject an economic substance analysis, which is challenged by the government in the case. Their argument is premature. The only question before this court is whether the obligation to close the short sale is a fixed liability within the meaning of Section 752. The IRS's consistent position is that it is. Every court considering the position has held it is, and the cases on which opposing counsel relies are readily distinguishable. If this court has no further questions, I will conclude now. Thank you. Your Honor, if I could address the economic substance issue first. The only reason we brought it up is because the government brought it up in their brief and have repeatedly made the statement that this is a non-economic loss, which is just a backer way of making economic substance. Let me deal then with Revenue Ruling 8877, because that is really a part of this case, the way the decision came down from the judge last time. 8877 has to be understood in the context of its issuance in 88. The IRS was responding to a congressional mandate to fix a specific problem having to do with cash basis partnerships and how accounts payable would be treated in cash basis partnerships. Revenue Ruling 8877 has a holding, just like courts' decisions have holdings. The holding has nothing to do with what the government now argues should be the broad reading of 8877. What the government did, and they started this in 1995 with their Revenue Ruling 9526, is they've taken a sentence in 8877, and they've twisted it around, and they've given it a much broader meaning and definition as if it were the holding of the Revenue Ruling, but it's not the holding of the Revenue Ruling. The Revenue Ruling really stands for the proposition that cash basis partnerships – well, I'm sorry, let me back up. The IRS was carving out a certain kind of liability, which was accounts payable. There is no question that accounts payable are a liability for purposes of Section 752, but because of the inequity of doing that, the IRS issued this Revenue Ruling that said, even though it is a liability, we're not going to treat it as a liability. And they said, if there's no increase in the basis of property in the partnership or no creation of the basis of property in the partnership, we won't treat it as a liability. The government has taken that, twisted it around, and tried to read it as a much broader holding of the Revenue Ruling. All right. Thank you. The case is submitted.